*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROBERT LEE HICKS,

Defendant-Appellant.

UNPUBLISHED
February 13, 2025
8:59 AM

Nos. 365011; 368313
Macomb Circuit Court
LC No. 2020-001556-FC

Before: RIORDAN, P.J., and O'BRIEN and GARRETT, JJ.

PER CURIAM.

In Docket No. 365011, defendant appeals as of right his jury-trial convictions of carjacking, MCL 750.529a, and armed robbery, MCL 750.529. Defendant was sentenced to 135 months to 20 years' imprisonment for the carjacking conviction, and 135 months to 20 years' imprisonment for the armed-robbery conviction. In Docket No. 368313, defendant appeals as of right following his resentencing, which occurred while Docket No. 365011 was pending, as a result of his motion to correct an invalid sentence. The trial court granted the motion and resentenced defendant to 100 months to 20 years' imprisonment for the carjacking conviction, and 85 months to 20 years' imprisonment for the armed-robbery conviction. In both matters,[1] we affirm.

## I. FACTUAL BACKGROUND

## A. EVENTS OF APRIL 1, 2020

On March 31, 2020, defendant met a man named Adam Cartwright at a gas station in Detroit, Michigan. After Cartwright offered defendant either money or drugs to clean his car, the two men began discussing where to obtain heroin. Then, they rode around the area in a stolen Kia Soul purchasing drugs and getting high. They "went all over the place" that night and into the

---

[1] This Court consolidated the appeals in Docket Nos. 365011 and 368313. See *People v Hicks*, unpublished order of the Court of Appeals, entered December 5, 2023 (Docket Nos. 365011 and 368313).

-1-

next morning, stealing items to use to purchase drugs. Cartwright purchased a BB gun from a drug house, and told defendant that he planned to use the BB gun to rob people. According to Cartwright, defendant was "all for it."

During the morning of April 1, 2020, the two men committed several armed robberies in Wayne County, and later that morning committed the robbery in Macomb County at issue in this case. The victim had purchased items from a Dollar General store in Eastpointe, Michigan, and walked to her van. The victim was carrying her car keys, her cell phone, and a small wallet. While the victim was placing her purchased items in her van, she saw a Kia Soul pull up behind her. A tall man and a short man got out of the vehicle. At trial, the victim identified defendant as the taller of the two men, who had been riding in the passenger seat of the Soul. The men were wearing masks. Cartwright greeted her and then said, "[D]on't move or you're dead. Don't say nothing." He then said, "[P]ut your hands up." The victim did as he directed. Defendant searched the victim and took several items from her, including her keys and wallet. Cartwright and defendant argued about who would drive the victim's van. Defendant then directed the victim to walk away, which she did. The victim then saw another shopper in the parking lot and signaled for him to call 911. The victim testified at trial that both robbers were "very content" during the robbery, and neither man was acting afraid. The two men drove away in the van and the Soul, although the victim did not see which man was driving which vehicle. A surveillance camera recorded the incident.

The two men stopped in a nearby area and loaded all the items from the van into the Soul. They got into the Soul with Cartwright's girlfriend, Angela May, and another man named OT Jones. Cartwright was driving. A witness saw the two men unloading items from the van. At trial, the witness testified that she could see the outline of a gun in the shorter man's pocket, but he did not point the gun at the taller man. As they began driving to another drug house, the police started chasing them. May and Jones asked Cartwright to stop, and they left the vehicle as it slowed down. Defendant did not ask to leave the Soul and directed Cartwright to "go, go, go." The two men were then involved in a police chase lasting 2½ hours. Eventually, Cartwright lost control of the Soul and crashed the vehicle. The police arrested Cartwright and defendant and transported them to a nearby hospital for medical treatment.

For his part, defendant did not deny participating in the robberies. Instead, he maintained that he acted under duress because Cartwright held him at gunpoint and threatened him into participating. Although defendant invoked his right against testifying at trial, defendant elected to testify at his preliminary examination. The prosecution therefore admitted the preliminary-examination testimony at trial over objection. During the preliminary examination, defendant testified that when Cartwright began talking about robbing individuals to pay for more drugs, defendant resisted the idea. However, Cartwright told defendant that he "owed" Cartwright for the drugs Cartwright had purchased on defendant's behalf. Defendant acknowledged during his testimony that he became separated from Cartwright on several occasions that evening, including while he was purchasing more drugs and stealing items from a store. At one point, Cartwright left the vehicle to go inside a gas station, leaving defendant inside the vehicle. Defendant acknowledged he was involved in the robberies, but maintained he did so under duress. Before the robbery of the victim, Cartwright pulled a gun on him and again said that defendant "owe[d]" him. Defendant acknowledged taking items from the victim's pockets and driving the Soul from the scene. Defendant further acknowledged that he was a passenger in the Soul during the police chase.

-2-

## B. PRETRIAL PROCEEDINGS

The prosecution charged defendant with carjacking, armed robbery, and receiving and concealing stolen property in relation to the incident involving the victim. Azhar Sheikh represented defendant during the district-court proceedings, and defendant decided to testify at the preliminary examination over Sheikh's advice. After the September 2020 bindover, the pretrial proceedings were paused for several months during the COVID-19 pandemic and resumed in March 2021. By April 2021, Sheikh asked the trial court to withdraw.

The trial court then appointed Stanley Szot as defendant's counsel. A few months later, Szot moved to withdraw, indicating that defendant had been uncooperative and untruthful. The trial court appointed Daniel Garon as defense counsel. The trial court adjourned the proceedings so Garon could review the file. Defendant complained about Garon shortly after Garon was appointed his counsel, claiming Garon was not visiting him in jail or discussing strategy with him. When defendant continued to complain about Garon, the trial court told defendant that he could either represent himself or retain his own attorney. However, the trial court refused to appoint another attorney.

Defendant elected to represent himself for the few months remaining before trial, but he continuously expressed his dissatisfaction with the trial court's given options, which he deemed an ultimatum. He explained at one point, "[B]ut I want to put on the record that [self-representation] was given to me as an ultimatum and not as a choice. But since we here [sic], I'm going to proceed." Defendant also accused the judge of racism and violating his constitutional rights. Garon continued to serve as standby counsel throughout the pretrial proceedings.

Before trial, defendant filed a series of additional pretrial motions. He moved the court to dismiss the case on the basis that the prosecutor had suppressed material, favorable evidence, in violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Defendant claimed that videotape evidence existed that impeached the victim's testimony, but did not elaborate further. The trial court denied the motion. Defendant also moved to dismiss the case on the basis of a speedy-trial violation, which the trial court denied because the COVID-19 pandemic and defendant's own actions caused most of the pretrial delay. Defendant also moved for a *Ginther*[2] hearing relating to his request for a new appointed attorney to replace Garon. The trial court denied the motion for a *Ginther* hearing, deeming the request premature. During the final pretrial hearing, after defendant continuously interrupted the trial court, the court warned defendant that because of his conduct, "You are on the verge of me not allowing you to represent yourself."

## C. TRIAL PROCEEDINGS

On the first day of trial, the trial court engaged in a colloquy with defendant over his choice to represent himself. The trial court explained that it was "not generally a very good choice and certainly not recommended" that defendant represent himself without a legal background or experience. Defendant elected to represent himself, but again expressed that he felt the court had

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

issued an ultimatum. The trial court appointed Garon as defendant's standby counsel for purposes of the trial. During defendant's voir dire, he began making a lengthy opening argument to the jury about his constitutional rights. The trial court cautioned defendant against asking inappropriate questions to the jurors. Defendant made lengthy speeches to the jury panel about how the trial court deprived him of his constitutional rights. He appropriately exercised some for-cause and peremptory challenges.

Outside the presence of the jury panel, the prosecutor raised the issue of defendant's suggestion to the potential jurors that the trial court deprived him of his right to counsel. Defendant accused the court of being "a kangaroo type court." The judge explained that she was on the verge of excusing defendant from the courtroom. When the jury pool returned to the courtroom, several of the potential jurors explained that they had already formed a bias against defendant based on his behavior during voir dire. Therefore, the trial court dismissed the panel.

After dismissing the potential jurors, the trial court stated:

Okay. So this has not gone well. Mr. Hicks, I do believe your behavior is disruptive. We cannot get through this trial. The jurors have become biased against you, because of the way that you've handled this case thus far. Despite me advising you on topics you should not address, you continue to readdress them, despite my corrections. Your behavior and comments are causing you to give yourself an unfair trial. I believe that you are not capable of controlling your behavior, and you continue to be disruptive, and I think your inability to control your disruptive behavior – I am going to appoint advisory counsel as your counsel to conduct the trial.

The trial court acknowledged that some of defendant's voir dire questions were intelligent. However, the trial court indicated, defendant's waiver of his right to counsel was equivocal because defendant had gone back and forth on whether he waived his right to counsel voluntarily or whether he waived his right because the court issued an ultimatum. The trial court then ruled that defendant's conduct disrupted and inconvenienced the court. Therefore, the trial court concluded that defendant had forfeited his right to self-representation and reappointed Garon as defendant's counsel.

On the second day of trial, defendant continued to challenge the trial court's authority to appoint Garon as his attorney. Defendant also was not wearing the suit that the trial court had purchased for him because he was having severe back pain. Then, defendant continued his diatribe that Garon's representation was violating his constitutional rights. The trial court cautioned defendant that if he continued to be disruptive, the court would remove him from the courtroom. Defendant then stated that he was removing himself from the courtroom of his own volition. The trial court noted that defendant could watch the proceedings virtually and ensured he had writing equipment to pass notes to Garon during the trial.

After defendant removed himself from the courtroom, the trial court made a record of what had occurred. The trial court cited *People v Kammeraad*, 307 Mich App 98; 858 NW2d 490 (2014), for the proposition that defendant forfeited his right to self-representation because of his behavior. The trial court explained, "His behavior makes it almost impossible to conduct business.

-4-

He continues to talk, and talk, and talk, without – the Court has to basically interrupt him in order to say anything at all." He had "refuse[d] to accept rulings," and "[brought] up issues that [the court] asked him . . . several times, to not bring up . . . ."

Garon confirmed he was prepared to try the case. Garon noted for the record, "[D]efendant has been, in my 33 years of experience of trying cases, by far the worst defendant that I've ever represented. He has been nothing but rude and uncooperative." Garon explained that he had "never seen anything like" defendant's behavior the previous day, and noted that the jurors told him after dismissal that they had all turned on defendant because of his behavior. He added that defendant was "out of control and is becoming violent." The parties then conducted voir dire, and both attorneys gave opening statements. No evidence was presented on the second day of trial.

On the third day of trial, the trial court permitted defendant to be present in the courtroom. Additionally, the trial court permitted the prosecution to admit evidence relating to the Wayne County armed robberies, concluding that they were not other acts for purposes of MRE 404(b). During the final day of trial, Cartwright, who was incarcerated, failed to appear in person to testify. The prosecutor explained that she prepared a writ of habeas corpus, but the Michigan Department of Corrections (the MDOC) recorded the wrong trial date for purposes of transporting Cartwright to the trial. However, the MDOC made Cartwright available to testify remotely by Zoom.

Outside the presence of the jury, Cartwright testified briefly as an offer of proof. In relevant part, he discussed the Wayne County armed robberies and denied threatening defendant into participating in any of the robberies. Defendant confirmed that despite this testimony he wanted Cartwright to testify in front of the jury. During Cartwright's testimony, defendant stood up and interjected again with a complaint about the fairness of the trial and the makeup of the jury pool. When defendant refused to stop talking, and accused Cartwright of lying, the trial court removed him from the courtroom. However, defendant was again able to view the proceedings from another room.

Defendant exercised his right against testifying, and the defense did not present any witnesses or evidence at trial. During his closing argument, Garon acknowledged defendant's disrespectful conduct during the periods he was present in the courtroom. However, he asked the jurors not to let defendant's courtroom behavior influence their decision. The trial court instructed the jury not to use defendant's absence in the courtroom against him. The jury convicted defendant of carjacking and armed robbery, but acquitted him of receiving and concealing stolen property (a motor vehicle).

### D. SENTENCING

The trial court originally sentenced defendant to 135 months to 20 years' imprisonment for both convictions, and defendant appealed in Docket No. 365011. While that appeal was pending, defendant moved to correct an invalid sentence, challenging the assessment of points for OV 4 (serious psychological injury to the victim) and OV 13 (continuing pattern of criminal behavior). The prosecution agreed that an error occurred in relation to two other OVs that defendant had challenged in the trial court, but which are not at issue in this appeal, and that a resentencing was necessary. During resentencing, the trial court agreed with the prosecutor's argument that the court properly assessed 25 points for OV 13. As for OV 4, the prosecutor relied on the victim's

victim-impact statement, in which she indicated that she now attended counseling for a preexisting mental-health condition twice per week. He argued that the victim's statement indicated that her counseling sessions had increased because of this incident. The trial court noted that the victim testified at trial that she had many children and little means, and that she had begged defendant and Cartwright not to take her groceries because of how hard it was to make ends meet and feed her children. The trial court added, "And she was terrified." The trial court assessed 10 points for OV 4. The trial court sentenced defendant to 100 months to 20 years' imprisonment for carjacking, and 85 months to 20 years' imprisonment for the armed-robbery conviction.

Defendant appealed in Docket No. 368313, and filed a postjudgment motion while that appeal was pending. Defendant moved to correct the new sentence as invalid on the basis of the trial court's assessment of 10 points for OV 4. Defendant argued, in relevant part, that there was no indication that the victim had increased her counseling because of the incident. The trial court ruled that the only logical interpretation of the victim's statements was that the victim was seeing her mental-health counselor more following the incident. Therefore, the trial court denied the motion.

## II. DOCKET NO. 365011

### A. SELF-REPRESENTATION

In Docket No. 365011, in both his principal brief and his Standard 4 brief, defendant first argues that the trial court committed a structural error automatically requiring a new trial by failing to honor his request to represent himself at trial. Alternatively, defendant argues the trial court abused its discretion by appointing Garon as his trial counsel. For the reasons discussed, we disagree.

We review the trial court's factual findings regarding the defendant's waiver of the right to counsel for clear error, but review a ruling on the interpretation of the law or the application of a constitutional standard de novo. *People v Russell*, 471 Mich 182, 187; 684 NW2d 745 (2004). Clear error occurs when this Court is left with a definite and firm conviction that a mistake was made. *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). The denial of self-representation is a structural error that is not subject to harmless-error analysis. *People v Duncan*, 462 Mich 47, 52; 610 NW2d 551 (2000). " '[T]he decision regarding substitution of counsel is within the sound discretion of the trial court and will not be upset on appeal absent a showing of an abuse of that discretion.' " *People v Buie*, 298 Mich App 50, 67; 825 NW2d 361 (2012) (citation omitted).

The Sixth and Fourteenth Amendments to the United States Constitution, as well as Article 1, § 13 of the Michigan's 1963 Constitution, protect the right to self-representation at trial. *People v King*, 512 Mich 1, 11; 999 NW2d 670 (2023). A Michigan statute also has codified the right to self-representation. MCL 763.1. When a defendant waives his right to the assistance of counsel, the waiver must be knowing, voluntary, and intelligent. *Russell*, 471 Mich at 188. The trial court generally should "indulge every reasonable presumption against waiver of fundamental constitutional rights." *People v Williams*, 470 Mich 634, 641; 683 NW2d 597 (2004) (quotation marks and citation omitted).

To effectuate the waiver of the right to counsel, the trial court must conclude that the following three factors are met: (1) the defendant's request is unequivocal; (2) the defendant asserts the right knowingly, intelligently, and voluntarily after the court has informed him of the dangers and disadvantages of representing himself; and (3) the defendant's self-representation " 'will not disrupt, unduly inconvenience and burden the court and the administration of the court's business.' " *King*, 512 Mich at 11-12, quoting *People v Anderson*, 398 Mich 361, 367-368; 247 NW2d 857 (1976). In other words, although the defendant may invoke the right of self-representation, there is no "absolute right" to go to trial without an attorney. *Anderson*, 398 Mich at 366. The trial court must substantially comply with these requirements for the defendant to waive counsel. *Russell*, 471 Mich at 191-192.

## 1. UNEQUIVOCAL WAIVER

In *Anderson*, 398 Mich at 367, our Supreme Court explained the following about the equivocal waiver requirement: "This requirement will abort frivolous appeals by defendants who wish to upset adverse verdicts after trials at which they had been represented by counsel." In *People v Dennany*, 445 Mich 412, 444; 519 NW2d 128 (1994) (opinion by GRIFFIN, J.), a plurality of our Supreme Court explained that the requirement that the request for self-representation be unequivocal prevents the defendant from using the right of self-representation to his or her advantage. The defendant must make an explicit choice to proceed with counsel or through self-representation. *Id*. The plurality explained:

> The requirement that a request for self-representation be unequivocal also serves an institutional purpose: It prevents a defendant from taking advantage of the mutual exclusivity of the rights to counsel and self-representation. A defendant who vacillates at trial between wishing to be represented by counsel and wishing to represent himself could place the trial court in a difficult position: If the court appoints counsel, the defendant could, on appeal, rely on his intermittent requests for self-representation in arguing that he had been denied the right to represent himself; if the court permits self-representation, the defendant could claim that he had been denied the right to counsel . . . . The requirement of unequivocality resolves this dilemma by forcing the defendant to make an explicit choice. If he equivocates, he is presumed to have requested the assistance of counsel. [*Id*. at 444 (quotation marks and citation omitted).]

In *Russell*, 471 Mich at 184, the defendant indicated at the beginning of trial that he wanted a new attorney. The trial court stated that it would entertain the defendant's request if he provided a valid reason for it beyond simply a personality conflict with his current attorney. *Id*. When the defendant failed to do so, the trial court offered him four options: (1) he could hire his own attorney; (2) he could use the court-appointed attorney (who was the defendant's second appointed attorney); (3) he could represent himself at trial; or (4) he could represent himself but have the attorney present as standby counsel. *Id*. at 184-185. The defendant stated that he did not " 'feel comfortable' " proceeding with his appointed counsel. *Id*. at 185. He reiterated his belief that the trial court must appoint him counsel. *Id*. at 186.

When the trial court later explained that the defendant could represent himself at trial, the defendant stated, in relevant part, " 'Well that's what you keep insisting that I do, and I'm telling you that I need competent counsel . . . .' " *Id.* (emphasis omitted). The defendant continued to reject the four options, but then the trial court empaneled the jury, and the defendant represented himself at trial from that point forward. *Id.* The question on appeal was whether the defendant made an unequivocal choice to represent himself. *Id.* at 187. Our Supreme Court concluded that the defendant had expressly rejected self-representation and never waived his right to counsel. *Id.* at 192. The Court explained, "While defendant was given clear choices, defendant consistently denied that *his* choice was self-representation." *Id.* In fact, the defendant had "steadfastly rejected" the option of going to trial with an attorney. *Id.* at 192-193. The Court noted that to the extent that any ambiguity existed on the issue, the Court must resolve that ambiguity in favor of representation. *Id.* at 193. The Court also noted that the defendant did not have the right to a third appointed attorney, considering that "no defendant is entitled to the appointed counselor of his choice." *Id.* at 193 n 25.

In this case, defendant's request was equivocal. As early as March 2022, defendant stated that he was only choosing to represent himself because he felt the trial court's ultimatum did not present him with a real choice: "[B]ut I want to put on the record that was given to me as an ultimatum and not as a choice. But since we here [sic], I'm going to proceed." During a May 2022 pretrial hearing, defendant explained, "The Court refused new counsel. This is grounds for a [*Ginther*] Hearing. I request new counsel." During a June 2022 pretrial hearing, defendant stated that the trial court was violating his right to counsel by insisting that he continue to work with Garon and that he was only representing himself because "I have given [sic] no other choice."

On the first day of trial, defendant again stated that he wanted to represent himself. But he complained about the trial court's perceived ultimatum and explained that he felt the court was denying his right to counsel. We find *Russell* applicable because defendant explained that he felt he had no other option but to represent himself. In other words, he consistently denied that self-representation was *his* choice. Defendant's conflicting statements give rise to the exact situation that the *Anderson* Court and the *Dennany* plurality wished to avoid, where a defendant could argue in the alternative that the court denied him of both his right to self-representation and his right to the effective assistance of counsel. Therefore, defendant's request to represent himself was equivocal in nature and, as a result, the trial court did not err by failing to allow him to represent himself.

## 2. DISRUPTION OF THE COURT

Alternatively, even if defendant made an unequivocal request to represent himself, the trial court did not clearly err when it concluded that self-representation would disrupt and burden the court.

In *Anderson*, 398 Mich at 368, our Supreme Court explained the third element as follows:

The third and final requirement is that the trial judge determine that the defendant's acting as his own counsel will not disrupt, unduly inconvenience and burden the court and the administration of the court's business. The people would have us announce a guideline which would preclude the assertion of the right to proceed

without counsel if it is not made before the trial begins. We cannot accede to this request. Although the potential for delay and inconvenience to the court may be greater if the request is made during trial, that will not invariably be the case. [*Anderson*, 398 Mich at 368.]

The Court then added, "Importantly, [the above requirements] do support the imperative that criminal adjudications must proceed in an orderly fashion and result in trustworthy guilt determinations." *Id.* We agree with defendant that the timing of the defendant's request may be a factor in determining whether self-representation would burden or disrupt the court. However, there is no legal basis to support defendant's argument that the timing of the waiver of the right to counsel is the only factor the trial court may consider when deciding whether self-representation would disrupt, unduly inconvenience, and burden the court. In fact, the broad language of the third *Anderson* factor suggests that the issue whether self-representation would "burden" or "disrupt" the trial court is much broader than simply whether the request was timely.

Like the trial court, we find *Kammeraad* illustrative on whether defendant forfeited his right to self-representation through his disruptive conduct. In *Kammeraad*, 307 Mich App at 116, this Court acknowledged that a criminal defendant has a statutory right to be present at trial. However, the defendant may lose or forfeit the right to be present at trial when the defendant is "so disorderly or disruptive that his trial cannot be continued while he is present." *Id.* at 117 (cleaned up).

In that case, the defendant was charged with several assaultive crimes. *Id.* at 100. The defendant stated early in the proceedings, " 'I take exception, I refuse any and all court appointed attorneys and their services. I refuse any and all trials.' " *Id.* at 102. He refused to participate in the trial-court proceedings, raised myriad claims against the court and the judicial process, and engaged in strange behaviors, including (1) showing up to court naked from the waist up, (2) insisting on an interpreter despite that he was fluent in English, and (3) using a wheelchair despite that he could walk without issue. *Id.* at 102-113. The defendant's extreme and disruptive behavior continued during the first day of trial. *Id.* at 114-115. The trial court therefore removed the defendant from the courtroom. *Id.* at 115-116. On appeal of the defendant's jury-trial convictions, this Court held that the defendant had forfeited his right to be present at trial because of his behavior. *Id.* at 117-121. This Court reasoned that the defendant had "showed nothing but contempt for the courts and the judicial proceedings," including by refusing to participate in the process, interrupting the court, making far-fetched claims, and refusing to answer the court's questions. *Id.* at 120.

Here, although defendant was able to appropriately exercise a few for-cause and peremptory challenges during voir dire, the record supports that for most of the pretrial and trial proceedings, defendant was extremely disruptive and combative. Defendant's problematic behavior began during the pretrial proceedings. Defendant made several pronouncements against the trial court and the attorneys, interrupted the court and the attorneys on multiple occasions, continuously raised issues the court had already addressed, and accused nearly everyone involved in his case of violating his constitutional rights. He demanded discovery that he had already received and attempted to relitigate motions he had already won. He argued constantly with the trial court about the law, despite acknowledging he had no legal training. He accused the court of racism. He also accused the prosecutor of committing a *Brady* violation without providing any

specific facts to support those assertions. The trial court warned defendant twice before trial that the court would revoke his ability to represent himself if his behavior continued.

Then, on the first day of trial, defendant continued to argue with the trial court and made lengthy speeches in front of the potential jurors during voir dire about his constitutional rights, comparing his rights to abortion rights. He argued that the trial court did not allow him to study the law. He accused the trial court of being a "kangaroo type court." The trial court yet again warned defendant that the court was on the verge of removing him from the courtroom. Defendant's conduct during voir dire was so egregious that several potential jurors admitted that they had already formed a bias against him before hearing any evidence, leading the trial court to dismiss the jury panel. At this point, when defendant's conduct had wasted an entire day of trial, the trial court determined that his disruptive behavior was hindering his trial and appointed Garon as his attorney.

Like in *Kammeraad*, defendant continuously showed contempt for the court and the judicial proceedings throughout the two-year history of the case, regularly interrupted the court with denunciations of the criminal-justice system, made far-fetched claims against all the attorneys with no legal or factual basis, and refused to cooperate in the proceedings. See *Kammeraad*, 307 Mich App at 120. The trial court did not err by concluding that defendant's self-representation would disrupt, unduly inconvenience, and burden the court. For these reasons, the trial court did not deprive defendant of his right to self-representation.

## 3. SUBSTITUTION OF COUNSEL

Alternatively, defendant argues that the trial should have appointed another attorney to represent him. Again, we disagree.

" 'An indigent defendant is guaranteed the right to counsel; however, he is not entitled to have the attorney of his choice appointed simply by requesting that the attorney originally appointed be replaced.' " *People v McFall*, 309 Mich App 377, 382; 873 NW2d 112 (2015) (citation omitted). The defendant must show good cause for the substitution and that the substitution will not disrupt unreasonably the proceedings. *Id.* at 382-383. "Good cause may exist when a legitimate difference of opinion develops between a defendant and his appointed counsel as to a fundamental trial tactic, when there is a destruction of communication and a breakdown in the attorney-client relationship, or when counsel shows a lack of diligence or interest." *Id.* at 383 (quotation marks and citations omitted). " 'A mere allegation that a defendant lacks confidence in his or her attorney, unsupported by a substantial reason, does not amount to adequate cause. Likewise, a defendant's general unhappiness with counsel's representation is insufficient.' " *Id.* (citation omitted). Additionally, the " 'defendant may not purposely break down the attorney-client relationship by refusing to cooperate with his assigned attorney and then argue that there is good cause for a substitution of counsel.' " *People v Traylor*, 245 Mich App 460, 462; 628 NW2d 120 (2001) (citation omitted). Good cause does not exist when the attorney fails to file futile motions. *People v Strickland*, 293 Mich App 393, 398; 810 NW2d 660 (2011).

Defendant argues that a fundamental disagreement existed on the duress defense. He points out that during a March 2022 pretrial, Garon noted that a private investigator's interview of Jones did not support the duress defense. However, Garon did not state that the defense itself was

frivolous. More importantly, Garon did advance the duress defense at trial. He argued during his closing argument that defendant was under duress, pointing to defendant's preliminary-examination testimony and the surveillance footage from the Dollar General parking lot. Defendant does not point out anything that he believes Garon should have done to further advance the duress defense. At most, defendant argued in the trial court that Garon should have filed certain motions on his behalf, such as a *Brady* motion and a motion for a *Ginther* hearing relating to Sheikh. However, as discussed later, those motions would have been futile because there was no evidence of ineffective assistance of counsel or a *Brady* violation. Good cause does not exist because of counsel's failure to file a futile motion. See *id*.

To the extent that defendant argues that there was a breakdown of communication and the attorney-client relationship, defendant contributed to this issue by finding fault with every attorney with whom he worked. See *People v Witherspoon (After Remand)*, 257 Mich App 329, 333; 670 NW2d 434 (2003) (explaining that "an appellant may not benefit from an alleged error that the appellant contributed to by plan or negligence"). While Garon and defendant had apparently not communicated much during the four-month period defendant was representing himself, Garon remained involved in the proceedings. He attended every pretrial hearing as standby counsel. There is no indication that the defense had changed fundamentally in that four-month period. Nor does defendant argue on appeal that Garon failed to communicate with him during the trial. To the extent that a breakdown existed, as the trial court found, defendant's conduct illustrated that his relationship with any attorney the court appointed would have broken down during trial. Therefore, good cause did not exist because of a breakdown in the attorney-client relationship.

The closer issue is whether Garon showed a lack of diligence or interest as revealed through his statements to the trial court. In this regard, we find some of Garon's statements understandable yet concerning. For example, during one pretrial proceeding, Garon stated, "I'll note that this particular defendant, in 33 years of practicing law, I have never had an individual be more rude, condescending, and difficult to deal with starting right from my very, very first jail interview that I had with him." During the second day of trial, Garon stated outside the presence of the jury, "[D]efendant has been, in my 33 years of experience of trying cases, by far the worst defendant that I've ever represented. He has been nothing but rude and uncooperative." Garon continued:

> He's vulgar. He's been insulting. And the fact that I'm even sitting here right now, makes me question my own usefulness in life as to why I'm putting myself through this, other than the fact of respect to you, and to–and to [the prosecutor], in terms of doing what I need to do to get this case processed.

While we acknowledge that Garon clearly had a personal viewpoint about defendant, and one that was understandable in light of the record of these proceedings, the record also supports that Garon was able to look beyond his feelings to represent defendant at trial diligently and intently. He filed several successful pretrial motions, resulting in the suppression of key evidence. He conducted a thorough voir dire, cross-examined the prosecution's witnesses, moved for a directed verdict, and presented a closing argument that was based on the evidence in the case. While Garon did not admit evidence or present witnesses at trial, Garon had explained before trial that he did not call Jones or May because his investigator could not find May, and Jones would not have been helpful to the defense. Defendant waived his right to testify, and does not take issue with that decision on appeal. In short, defendant does not highlight one thing Garon did before or

at trial that he should not have done, or one thing Garon did not do before or at trial that defendant believes he should have done. It also is important to note that Garon was stating his issues with defendant on the record, and outside the presence of the jury, because defendant was placing Garon's conduct at issue in the case. At no point did Garon reveal his personal feelings about defendant to the jury. When Garon acknowledged defendant's disruptive behavior in front of the jury during his closing argument, it was part of a strategy to instruct the jury not to consider defendant's courtroom behavior when rendering its verdict. Therefore, the trial court did not abuse its discretion by finding no good cause existed to appoint a fourth attorney to represent defendant at trial.

## B. CONFRONTATION CHALLENGE

Next, defendant argues that the trial court violated his confrontation rights by allowing Cartwright to testify virtually at trial. We conclude that defendant waived this issue by agreeing to Cartwright's virtual testimony even after hearing that testimony as an offer of proof, which also occurred virtually. Waiver is "the intentional relinquishment or abandonment of a known right." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted). To waive a right, the party must "clearly express satisfaction with a trial court's decision." *People v Davis*, 509 Mich 52, 64; 983 NW2d 325 (2022) (cleaned up). The reason that Cartwright testified at trial was because defendant insisted on securing Cartwright's testimony. When Cartwright appeared virtually via Zoom, the trial court heard some testimony from Cartwright as an offer of proof. Defendant had the opportunity to hear Cartwright testify that he did not force or threaten defendant into participating in the robberies. Garon explained that he warned defendant that, based on the statement Cartwright provided the police, Garon did not expect his testimony to be favorable. Nevertheless, defendant insisted on his trial testimony. Defendant, who had earlier objected to Cartwright appearing via Zoom, did not dispute Garon's statement. Then, the trial court firmly asked defendant, "Are we going to have Mr. Cartwright testify in front of the jury, or are we not?" Defendant confirmed, "Yes, we are." Defendant therefore had the opportunity to change his mind about Cartwright's testimony, but he decided to proceed with Cartwright's testimony. In other words, the trial court offered defendant an opportunity to refuse to have Cartwright testify because he was appearing via Zoom, but defendant declined that opportunity. Under these circumstances, defendant waived the issue, and we will not review it further.

## C. OTHER-ACTS EVIDENCE

Next, defendant argues that the trial court abused its discretion by admitting evidence about the Wayne County armed robberies that occurred earlier on the day of the incident. We disagree.

At the outset, we note that this issue is unpreserved. "To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Defendant objected to the admission of evidence about the three Wayne County armed robberies. However, defendant's general objection to the admission of the evidence did not raise the same grounds for objection that he asserts on appeal—whether the evidence was conduct-at-issue evidence and whether the prosecution provided timely notice of its intention to use the evidence. Therefore, the issue is unpreserved.

-12-

Because defendant did not preserve this issue, our review is for plain error affecting defendant's substantial rights. See *People v Serges*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 15. " 'To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights.' " *Id*. at ___; slip op at 15, quoting *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "To establish that a defendant's substantial rights were affected, there must be 'a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings.' " *Serges*, ___ Mich App at ___; slip op at 15, quoting *Carines*, 460 Mich at 763. " 'Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence.' " *Serges*, ___ Mich App at ___; slip op at 15, quoting *Carines*, 460 Mich at 763.

MRE 404(b) provided, at the time of trial, as follows:

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

(2) The prosecution in a criminal case shall provide written notice at least 14 days in advance of trial, or orally on the record later if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial and the rationale, whether or not mentioned in subparagraph (b)(1), for admitting the evidence. If necessary to a determination of the admissibility of the evidence under this rule, the defendant shall be required to state the theory or theories of defense, limited only by the defendant's privilege against self-incrimination. [MRE 404(b), as amended October 11, 2017, 501 Mich ccviii (2019).]

To admit other-acts evidence under MRE 404(b), the prosecution must establish that the evidence is relevant to a proper purpose and does not bear solely on the defendant's character or propensity to commit a crime. *People v Mardlin*, 487 Mich 609, 615; 790 NW2d 607 (2010). The evidence is inadmissible if the only relevance of the evidence is to show the defendant's character or propensity to commit the charged offense. *People v Watkins*, 491 Mich 450, 468; 818 NW2d 296 (2012). MRE 404(b) only applies to evidence of crimes, wrongs, and acts that are "other" than the conduct at issue in the case. *People v Jackson*, 498 Mich 246, 262; 869 NW2d 253 (2015). Thus, acts that are part of the same "conduct at issue" do not fall within MRE 404(b). *Id*.

In *People v Delgado*, 404 Mich 76, 79; 273 NW2d 395 (1978), the prosecution charged the defendant with drug-related crimes in two separate cases relating to two drug sales to the same undercover police officer, which occurred five days apart. The defendant's attorney moved to consolidate the two cases, arguing that they constituted one transaction. *Id*. at 79-80. The trial court denied the motion to consolidate but allowed the prosecution to admit testimony about the

earlier drug sale at the trial on the later sale. *Id*. at 80. On appeal, the defendant argued that the evidence about the earlier drug sale was improper propensity evidence. *Id*. at 82-83. This Court disagreed, explaining that the two sales were "inextricably related," and that the second sale "followed from" the first sale, "as does an effect follow from a cause." *Id*. at 84. The first sale was a "sample purchase" that was a condition precedent to the later sale. *Id*. at 83-84. Therefore, the jury could hear about the first sale because it was "an integral part of the evidence which were incidental to" the second sale. *Id.*

Like the two crimes in *Delgado*, the armed robberies here were inextricably related and part of the same conduct at issue. Defendant and Cartwright committed the three other crimes on the same day, and within hours of when they carjacked the victim. The two men also committed all the crimes for the same purpose—to obtain money to pay for their illegal-drug use. Therefore, like in *Delgado*, the armed robberies were not discrete incidents involving other crimes. Rather, they were part of the same conduct at issue. Therefore, MRE 404(b) did not preclude the admission of the evidence at trial, and the trial court did not commit a plain error by allowing the prosecution to admit the evidence.

Alternatively, assuming that *Delgado* is not controlling because that case was decided on the basis of MCL 768.27, not the overlapping MRE 404(b), see *Jackson*, 498 Mich at 269, the evidence was admissible under MRE 404(b)(1) as evidence of defendant's motive and to negate the duress defense. As the prosecution advocated at trial, the evidence of defendant's previous crimes on the day of the incident was admitted to support his motive to commit crimes to pay for the illegal drugs that he and Cartwright had consumed that day. Moreover, the evidence also was relevant to respond to defendant's duress defense. The fact that defendant participated in four robberies within hours of each other would tend to disprove that defendant felt forced or threatened into participating in the carjacking of Brown. Therefore, the evidence was not relevant only to establish defendant's character or propensity to commit the charged offenses. See *Watkins*, 491 Mich at 468. Consequently, the evidence was admissible under MRE 404(b)(1).

However, if MRE 404(b) applies here, the closer issue is whether the trial court erred by admitting the evidence because the prosecution did not notify defendant about its intended use of the evidence. The prosecution concedes on appeal that it did not provide the required notice. But defendant has not demonstrated prejudicial error. Defense counsel did not raise a specific challenge to the admission of this evidence in the trial court, and noted instead that defendant had opened the door to the evidence because of his preliminary-examination testimony. Defendant does not argue on appeal how the lack of notice affected his trial strategy. He was aware of the existence of evidence about the preliminary armed robberies because he testified about them during his September 2020 preliminary examination. His attorney lamented during the pretrial proceedings that the prosecution could admit the preliminary-examination testimony because defendant chose to testify. Yet, he did not move to exclude the testimony. When the prosecution raised the issue at trial, Garon conceded that defendant had opened the door to the admission of the evidence about the earlier armed robberies because he testified about them. Therefore, to the extent the trial court erred, defendant cannot show that the error affected the outcome of the lower court proceedings. *See Carines*, 460 Mich at 763.

For these reasons, the trial court did not plainly err by admitting the evidence at issue under *Delgado* because it was not subject to MRE 404(b). Alternatively, even if the evidence was subject

to MRE 404(b), it was admissible under that court rule to show motive and to negate the duress defense, and any error that occurred by the failure to provide notice was not prejudicial. See *Carines*, 460 Mich at 763.

## D. SPEEDY-TRIAL

Next, defendant argues that his right to a speedy trial was denied when more than two years passed between his incarceration and his trial. In his Standard 4 brief, defendant adds that the trial court should have dismissed the case under the 180-day rule. We disagree.

Starting with the speedy-trial issue, the issue whether a defendant was denied his right to a speedy trial involves a constitutional-law question, which we review de novo. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006). We review the trial court's factual findings for clear error. *Id*.

The United States Constitution and the Michigan Constitution both guarantee a criminal defendant the right to a speedy trial. US Const, Am VI; Const 1963, art 1, § 20. The right also is enforced through statute and court rule. MCL 768.1; MCR 6.004(A). The timing for determining the delay begins when the defendant is arrested. *Williams*, 475 Mich at 261. To determine whether a defendant's constitutional right to a speedy trial has been violated, this Court will balance four factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262.

The first factor is the length of the delay. If the delay before trial is 18 months or more, then prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury to the defendant. *Id*. at 262. In this case, the delay between defendant's arrest, in early April 2020, and the trial, in mid-July 2022, was more than 27 months. For this reason, prejudice is presumed, and the burden will shift to the prosecution to show that defendant did not suffer an injury because of the delay. See *id*.

The next factor is the reason for the delay. This Court will examine whether each period of the delay can be attributed to the defendant or the prosecution. *People v Waclawski*, 286 Mich App 634, 666; 780 NW2d 321 (2009). "Although delays inherent in the court system, e.g., docket congestion, are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Williams*, 475 Mich at 263 (quotation marks and citation omitted). The time it takes to gather and analyze evidence also is a legitimate reason for delay. *People v Cain*, 238 Mich App 95, 113; 605 NW2d 28 (1999). When the defendant requests an adjournment of the trial, the delay related to the adjournment is attributed to the defendant. *Id*. Also, the time spent adjudicating motions filed by the defense is attributed to the defendant. *Id*. Delays attributable to the COVID-19 pandemic are neutral factors which are not attributable to the prosecution. *People v Smith*, ___ Mich App, ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 5. Unexplained delays and scheduling delays are attributed to the prosecution. *Waclawski*, 286 Mich App at 666. The delay caused by the withdrawal of defense counsel cannot be attributed to the prosecution. See *People v Collins*, 388 Mich 680, 691; 202 NW2d 769 (1972).

-15-

The delay in this case can be divided into two periods. The first period of delay was roughly between April 1, 2020 and March 15, 2021. This period correlates with the period of trial restrictions because of the COVID-19 pandemic. See *In re Sanborn*, 337 Mich App 252, 269-270; 976 NW2d 44 (2021) (explaining that the Michigan Supreme Court issued several administrative orders in March 2020 that restricted the hearings that could be conducted in the trial court); Administrative Order No. 2020-1, 505 Mich xcix (2020), rescinded July 26, 2021; Administrative Order No. 2020-2, 505 Mich cii (2020), rescinded July 26, 2021. AO 2020-2 initially instructed trial courts to adjourn all criminal matters, including jury trials, for a limited period. *People v Witkoski*, 341 Mich App 54, 57; 988 NW2d 790 (2022). See also AO 2020-2. Later, the order was extended indefinitely. *Witkoski*, 341 Mich App at 57-58; Administrative Order No. 2020-12, 505 Mich cxlii (2020). If there were any doubt about the reason for the delay, during the March 15, 2021 pretrial hearing, the trial court explained that jury trials were just beginning in the Macomb Circuit Court after the peak of the COVID-19 pandemic. Because this period of delay correlates with the COVID-19 pandemic, this period was neutral and cannot be attributed to the prosecution. See *Smith*, ___ Mich App at ___; slip op at 5.

The second period of delay is between March 2021 and July 2022. Defendant concedes on appeal that "much of the remaining delay is attributable to Mr. Hicks' motions, investigations, and new-attorney requests." He argues, however, that this Court should not weigh the delay against him because his attorneys caused the delay. However, our Supreme Court has already held that the withdrawal of defense counsel cannot be attributed to the prosecution, without regard to whether the defendant or the attorney was at fault for the withdrawal. See *Collins*, 388 Mich at 691. Moreover, the record shows that defendant's delays went far beyond his disputes with counsel and caused much of the delay in this case. For example, defendant filed and refiled numerous pretrial motions that the court had to decide before trial. Defendant also hired a private investigator to meet with Jones during this period. In fact, there were only two minor instances in which the trial court adjourned the trial at the prosecution's request. Because defendant caused most of the delay following the COVID-19 pandemic, this factor weighs in favor of the prosecution.

The next factor is defendant's assertion of the right. There is no dispute that defendant asserted his right when he moved to dismiss the charges because of a speedy-trial violation. Therefore, this factor favors defendant.

The final factor is the prejudice to defendant. Prejudice is presumed because of the length of the delay. There are two types of prejudice: prejudice to the defendant's person and prejudice to the defense of the case. *Williams*, 475 Mich at 264. Anxiety alone does not establish prejudice. *Smith*, ___ Mich App at ___; slip op at 6. " '[I]mpairment of defense is the most serious' form of prejudice in the context of a speedy-trial claim 'because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.' " *Id*. at ___; slip op at 6 (citation omitted). The prejudice is obvious when a witness dies or disappears during the delay. *Id*. at ___; slip op at 6. However, general or vague allegations of prejudice are insufficient to establish a speedy-trial violation. *Id*. at ___; slip op at 6. "[A] reviewing court should look for examples about how the delay between arrest and trial harmed the defendant's ability to defend against the charges." *Id*. at ___; slip op at 6. As noted earlier, when prejudice is presumed, the burden shifts to the prosecution to show that there was no injury to the defendant. *Williams*, 475 Mich at 262. When this is the case, "a 'presumptively prejudicial delay triggers an inquiry into the other factors to be considered

-16-

in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial.' " *Id*. (citation omitted).

Defendant does not argue that the delay caused any prejudice to his defense of the case. Instead, he argues that he suffered personal prejudice because the delay caused him stress, loss of income, and loss of contact with his family members and friends. He argues his personal prejudice was particularly bad during the height of the pandemic because of his fear that he would contract COVID-19 while incarcerated. However, anxiety about the COVID-19 pandemic or incarceration in general does not establish prejudice. See *Smith*, ___ Mich App at ___; slip op at 6.

The last step in the inquiry is to balance the competing factors to determine whether defendant was deprived of his right to a speedy trial. When balancing the four factors, the length of the delay and the assertion of the right factor in defendant's favor. Defendant also undoubtably suffered some personal prejudice during the delay. But the reasons for the delay and prejudice to the defense weigh in favor of the prosecution. The delay attributed to the prosecution is minimal. On the other hand, defendant contributed significantly to the delay by requesting a new attorney on multiple occasions and frequently requesting access to additional discovery. For these reasons, we conclude that no speedy-trial violation occurred.

For the 180-day rule, an issue generally is preserved for appeal if it is raised, addressed, or decided in the trial court. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227-228; 964 NW2d 809 (2020); *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). During a pretrial hearing, Garon mentioned defendant's intention to "address the 180-day rule." However, defendant did not move for relief under the 180-day rule or raise the 180-day rule in any of his speedy-trial motions. Therefore, he did not preserve the issue for appellate review. Because defendant did not preserve the claim, we review it for plain error. See *Carines*, 460 Mich at 763.

MCL 780.131(1) outlines the requirements under the 180-day rule and provides, in relevant part:

> Whenever the department of corrections receives notice that there is pending in this state any untried warrant, indictment, information, or complaint setting forth against any inmate of a correctional facility of this state a criminal offense for which a prison sentence might be imposed upon conviction, the inmate shall be brought to trial within 180 days after the department of corrections causes to be delivered to the prosecuting attorney of the county in which the warrant, indictment, information, or complaint is pending written notice of the place of imprisonment of the inmate and a request for final disposition of the warrant, indictment, information, or complaint. The request shall be accompanied by a statement setting forth the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time or disciplinary credits earned, the time of parole eligibility of the prisoner, and any decisions of the parole board relating to the prisoner. The written notice and statement shall be delivered by certified mail.

When a violation of the 180-day rule occurs, "no court of this state shall any longer have jurisdiction thereof, nor shall the untried warrant, indictment, information or complaint be of any

further force or effect, and the court shall enter an order dismissing the same with prejudice." MCL 780.133. A violation of the 180-day rule is distinct from a speedy trial violation. *Witkoski*, 341 Mich App at 60. The trial itself does not necessarily have to occur within 180 days. *Id*. "Rather, if apparent good-faith action is taken well within the period and the people proceed promptly and with dispatch thereafter toward readying the case for trial, the condition of the statute for the court's retention of jurisdiction is met." *Id*. (quotation marks and citation omitted). In other words,

> the rule requires dismissal of the case if the prosecution fails to commence action on charges pending against an inmate within 180 days after the Department delivers notice of the inmate's imprisonment. But the rule does not require that a trial be commenced or completed within 180 days of the date notice was delivered. [*Id*. at 61 (cleaned up).]

The prosecutor must act promptly to move the case to the point where it is ready for trial within the 180-day period. *Id*. The prosecutor must have an ongoing, genuine intent to proceed promptly. *Id*.

In this case, it is not clear whether and when the 180-day period was triggered. However, even assuming that notice was provided at any point in the proceedings, there is nothing in the record to suggest that the prosecution delayed proceedings in a bad-faith attempt to delay trial. See *id*. at 62. To the contrary, the record demonstrates that the prosecution took immediate action to prosecute the case, including by filing charges on the day of the incident. The case was bound over to the circuit court within a few months, and the trial court held a few preliminary pretrial hearings. As discussed earlier, the first year of delay in defendant's case was the result of the suspension of jury trials in response to the COVID-19 pandemic. There is no indication the prosecution could have done anything during this period to move the case forward. In *Witkoski*, this Court factored the suspension of jury trials during the COVID-19 pandemic into its analysis on this issue, noting that "criminal proceedings and jury trials in our state courts were suspended weeks before the time period had expired," and indicating that the prosecution could not be faulted for this period of delay. *Id*. at 64. Defendant caused the next year of delay. Therefore, defendant has not established a violation of the 180-day rule.

## E. INEFFECTIVE ASSISTANCE

In his Standard 4 brief, defendant argues that he was deprived of the effective assistance of counsel during the pretrial and trial proceedings. We disagree.

A defendant preserves the issue of ineffective assistance of counsel by moving the trial court for a new trial or a *Ginther* hearing, *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), or by moving this Court to remand the case for a *Ginther* hearing, *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). Both before and at trial, defendant requested a *Ginther* hearing on Garon's performance, raising the same general issues he raises on appeal. He also moved the trial court for a *Ginther* hearing on Sheikh's performance, claiming Sheikh did not provide him with discovery or represent his interests. Therefore, defendant preserved the issue as it relates to Garon and Sheikh. To the extent that defendant's claim also extends to Szot, it is not preserved because defendant did not move for a new trial, *Ginther* hearing, or remand in relation to Szot. See *Heft*, 299 Mich App at 80.

-18-

A claim of ineffective assistance of counsel involves a mixed question of fact and constitutional law. *Isrow*, 339 Mich App at 531. We review the trial court's findings of fact for clear error, and review the legal questions involved de novo. *Id*. When, as in this case, no *Ginther* hearing occurs, we review de novo the entire record to determine whether trial counsel's representation was ineffective. *People v Rose*, 289 Mich App 499, 524; 808 NW2d 301 (2010). "This Court reviews unpreserved claims of ineffective assistance of counsel for errors apparent on the record." *People v Johnson*, 293 Mich App 79, 90; 808 NW2d 815 (2011).

Criminal defendants have the right to the effective assistance of counsel under the United States Constitution and the Michigan Constitution. *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023). To establish a claim of ineffective assistance of counsel entitling the defendant to a new trial, " 'a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that that outcome would have been different.' " *Id*. (citation omitted). A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citations omitted). Attorneys have broad latitude when determining trial strategy, and there is a strong presumption that counsel's performance was part of that strategy. *Id*. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019) (quotation marks and citation omitted). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Counsel's performance is presumed to be effective, but the court cannot insulate counsel's performance from review by characterizing it as trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). Defendant has the burden to establish the factual predicate of his ineffective assistance of counsel claim. *People v Thurmond*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361302); slip op at 12. Remand for a *Ginther* hearing is appropriate when the defendant sets forth additional facts to demonstrate that a further development of the record will advance the defendant's position, or sets forth facts that could provide a basis for relief. *Id*. at ___; slip op at 12.

Defendant first argues that Sheikh failed to inform defendant of key discovery in the case, which caused defendant to feel he had no option but to testify at the preliminary examination. Defendant repeatedly claimed in the trial court that Sheikh failed to provide key discovery in the case, but he never explained what that evidence was. For his part, by April 2021, Sheikh reported that he had obtained all discovery from the prosecution and gave defendant all the discovery. Defendant continued to raise the issue during the pretrial phase, but never substantiated his claim. The only specific videotape recording that was discussed on the record was the Zoom recording of a probable-cause conference that occurred while the case was in the district court. On the record, Garon explained that defendant believed the prosecution made a statement during that conference about whether defendant and Cartwright were no longer codefendants during a probable-cause conference. However, even if a recording of the probable-cause conference existed, the issue whether Cartwright and defendant were codefendants does not have any bearing on defendant's innocence or guilt. Therefore, defendant cannot show deficient performance or that the issue was prejudicial.

On appeal, defendant argues that a videotape existed that would have established that the victim lied during her preliminary examination, and that his attorneys conspired with the

prosecution to withhold this evidence from defendant. However, defendant does not substantiate his argument by providing, or even describing, the video evidence. We recognize that documents, or at least pleadings, prepared by pro se parties are held to less stringent standards than documents prepared by a lawyer. *Haines v Kerner*, 404 US 519; 92 S Ct 594; 30 L Ed 2d 652 (1972). Nevertheless, " '[a]n appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims . . . .' " *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009) (citation omitted). Therefore, defendant's argument relating to the alleged videotape evidence lacks merit.

Defendant also criticizes Sheikh for failing to move to dismiss the charges on the basis of a speedy-trial violation. The decision whether to file a pretrial motion is an issue involving professional judgment and trial strategy. *Traylor*, 245 Mich App at 463. Sheikh withdrew in April 2021, which was about a year after defendant's arrest. By that point, the length of the delay was not presumptively prejudicial. As noted earlier, the COVID-19 pandemic caused the one-year delay that occurred before Sheikh withdrew, which is a neutral factor that could not be attributed to the prosecution. Defendant also did not demonstrate any prejudice to his defense of the case because of the delay. Therefore, Sheikh was not ineffective for failing to file a meritless motion. See *Ericksen*, 288 Mich App at 201. The trial court heard and denied the motion before trial, so defendant cannot demonstrate prejudice. See *Traylor*, 245 Mich App at 463.

To the extent defendant is critical of his decision to testify at his preliminary examination, which resulted in the admission of the testimony at trial, defendant confirmed on the record that he decided to testify over Sheikh's advice:

> *Mr. Sheikh*: Yes, your Honor, I just want to indicate for the record, against my advice, my client does wish to take the stand to testify. Mr. Hicks, I have told you that you do not have to take the stand, nobody can force you to take the stand, and conversely nobody can keep you off the stand, do you understand that? Sir, speak up.
>
> *The Defendant*: Yes.
>
> *Mr. Sheikh*: And I advised you not to take the stand, correct?
>
> *The Defendant*: Correct.
>
> *Mr. Sheikh*: And despite that you wish to take the stand?
>
> *The Defendant*: Yes.

On appeal, defendant does not challenge the accuracy of the statement he made on the record. Therefore, Sheikh did not render ineffective assistance in relation to the preliminary examination.

As for Garon and Szot, defendant vaguely argues that these attorneys also failed to inform him of "electronic discovery of the crime scene," but once again does not support or rationalize the basis for his claim. Defendant argues that Garon's trial performance was "completely ineffective," and instructs this Court to review the full set of trial transcripts. Once again,

defendant does not point to any specific instance of ineffective assistance during the trial proceedings. He does not set forth additional facts to show that further development of the record at a *Ginther* hearing would advance his position. And he cannot rely on this Court to rationalize his claims for him. See *Payne*, 285 Mich App at 195. Defendant has not established any instances of ineffective assistance of counsel or that remand for a *Ginther* hearing is appropriate.

## F. *BRADY* VIOLATION

Defendant next argues in his Standard 4 brief that the trial court committed a *Brady* violation because the prosecution withheld evidence at the preliminary examination. We conclude defendant has abandoned this issue by failing to describe, in any detail, the nature of the evidence he believes the prosecutor suppressed. As noted earlier, defendant asserts that a videotape recording existed that apparently was not in the prosecutor's file but that would show that the victim lied during the preliminary examination. However, defendant has not provided any support for his bare assertion that a videotape exists. He has not explained what, specifically, the victim lied about. He also does not explain how the videotape recording would have been favorable or material. Again, " [a]n appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims . . . .' " *Payne*, 285 Mich App at 195 (citation omitted). Additionally, "[a]n appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004). Therefore, defendant has abandoned this issue on appeal, and we will not discuss it further.

## G. RIGHT TO BE PRESENT AT TRIAL

Defendant also argues in his Standard 4 brief that the trial court deprived him of his right to appear for trial in person by removing him from the courtroom during trial. We disagree.

We review this constitutional issue de novo. *Buie*, 298 Mich App at 56. MCL 768.3 affords a criminal defendant a right to be present during trial. *Kammeraad*, 307 Mich App at 116. The Confrontation Clauses and Due Process Clauses of the federal and state constitutions also implicitly guarantee this right. *Id*. at 116-117. However, a defendant may waive or forfeit his right to be present during his trial. *Id*. at 117. " 'A valid waiver of a defendant's presence at trial consists of a specific knowledge of the constitutional right and an intentional decision to abandon the protection of the constitutional right.' " *Buie*, 298 Mich App at 57 (citation omitted). In *Buie*, this Court held that the defendant did not waive his right to be present during the trial when he voluntarily left the courtroom. *Id*. at 58. Specifically, there was no indication in the record that the defendant was informed of his right to be present, which is required to intentionally relinquish a known right. *Id*.

In this case, in contrast, defendant voluntarily left the courtroom on the second day of trial with knowledge of his right to be present. During that proceeding, defendant interrupted and argued with the trial court. The trial court warned defendant that if he continued to talk over the court, then he would be removed from the courtroom. At that point, defendant started gesturing to the deputies. When the trial court asked what defendant was doing, he responded: "Removing myself. Removing myself from the court. I would like copies of my case file and transcripts before anything proceeds. I would also like to exercise my constitutional right to be present in

anything pertaining to the jury." Before he left the courtroom, defendant made the following paradoxical statement: "I assert my constitutional rights to be present during this process. It cannot continue without my presence." Defendant's act of leaving the courtroom of his own volition was an intentional abandonment of his known right to be present that day.

However, we acknowledge the trial court also removed defendant from the courtroom on the fourth day of trial. Therefore, it remains necessary to examine whether defendant forfeited his right to be present on that day as well.

As discussed earlier, in *Kammeraad*, this Court held that the defendant forfeited his right to be present for trial because of his disruptive and disorderly behavior. *Kammeraad*, 307 Mich App at 118 and n 6. Similarly, defendant demonstrated contempt and disrespect for the trial court at nearly every pretrial hearing and throughout the first and second days of trial. For example, during the pretrial proceedings, defendant raised numerous complaints about the three attorneys who were appointed to represent him, including that they did not provide him with discovery or file motions on his behalf. He complained about the constitutionality of the process early in the proceedings. He interrupted and argued with the trial court when discussing discovery issues. He accused the judge of racism and continued to argue with the judge, who removed him from a pretrial hearing. He insisted that he should be able to argue motions he had already won. Then, shortly before trial, defendant insisted that the prosecution was still withholding evidence. The trial court cautioned defendant after he continued to ignore its instructions, "You are on the verge of me not allowing you to represent yourself."

On the first day of trial, defendant complained that the trial court had given him an unconstitutional ultimatum regarding self-representation. The trial court continued to caution defendant that Garon would take over the defense if he could not behave properly. Defendant interrupted the opening instructions, stating "all the information to this case has not been presented to you." The trial court admonished defendant to stop speaking and that they would address the matter later. During voir dire, he began making a lengthy opening argument to the jury about his constitutional rights, and the trial court cautioned defendant that this was not the time for his opening statement. Defendant asked the jurors inappropriate questions about their religious beliefs. During his voir dire, defendant again went on a diatribe against the court, arguing that the trial court was favoring the prosecutor. At one point, the trial court warned defendant that he was breaking too many court rules. Yet defendant made another lengthy statement about how the trial court deprived him of his constitutional rights. Defendant's conduct was so egregious that several potential jurors explained that they had already formed a bias against defendant. Therefore, the trial court had to excuse the potential jurors from the courtroom and ultimately dismissed them.

Nevertheless, the trial court did not remove defendant from the courtroom until the second day of trial, when defendant repeated his grievances against Garon, the prosecutor, and the court. He continued to challenge the trial court's authority to appoint Garon as his attorney. And he appeared for court in his prison attire instead of the suit the trial court had provided. The trial court permitted defendant to appear for the third and fourth days of trial. However, during Cartwright's testimony on the fourth day of trial, defendant interjected and claimed that the proceedings were biased against him. He stated, "There's no black people in the jury[.]" The trial court then removed defendant from the courtroom, but allowed him to view the proceedings virtually. Thus, defendant's disrespectful, combative, and disruptive behavior warranted his removal from the

courtroom. Defendant's behavior was relentless, even after numerous warnings by the trial court and after his assurance that he would behave. Under these circumstances, defendant forfeited his right to be present at trial because of his contemptuous and disruptive behavior.

Additionally, defendant has not demonstrated prejudice. " '[T]he test for whether defendant's absence from a part of his trial requires reversal of his conviction is whether there was any reasonable possibility that defendant was prejudiced by his absence.' " *Buie*, 298 Mich App at 59 (citation omitted; alteration in original). Defendant was absent for the second day of trial, which encompassed the jury voir dire, the opening statement by the prosecutor, and the trial court's opening remarks to the jury. He was also absent for some of the testimony on the fourth day of trial. Defendant complains that he did not have a say in the jury-selection process. But the trial court allowed defendant to view the proceedings virtually and communicate with Garon. He was therefore able to see and hear the prospective jurors and provide his input in the voir dire questions. Furthermore, the trial court permitted defendant to be present for the third day of trial and for some of the fourth day of trial. The jury was able to observe defendant in the courtroom. The trial court instructed the jury not to use defendant's absence in the courtroom against him. The jury is presumed to have followed its instructions, which are presumed to cure most errors. See *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). There is no reasonable possibility that defendant experienced prejudice from his removal from the courtroom.

## H. RIGHT TO PRESENT A DEFENSE

Defendant next argues that the trial court deprived him of his right to raise a duress defense at trial because the court prevented him from calling certain witnesses in his defense. We disagree.

A defendant preserves the issue whether he was denied the right to present a defense by presenting his claim in the trial court. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012). While defendant complained throughout the trial proceedings that the trial court and the attorneys were depriving him of his due-process rights, defendant did not raise the specific issue he now raises on appeal. Therefore, we deem it unpreserved. When the defendant fails to preserve the issue, we review it for plain error affecting the defendant's substantial rights. *Id*.

A criminal defendant has a fundamental right to present evidence in his own defense. *People v Unger*, 278 Mich App 210, 249, 749 NW2d 272 (2008). However, the defendant's right to present evidence in his defense is not absolute, and may "bow to accommodate other legitimate interests in the criminal trial process." *Id*. at 250 (quotation marks and citation omitted). This includes the rules and procedures the trial court has established. *Id*. Additionally, a Michigan rule of evidence does not infringe upon the defendant's right to present his defense unless the rule was "arbitrary or disproportionate to the purposes it was designed to serve." *King*, 297 Mich App at 474 (quotation marks and citation omitted).

Defendant argues that the trial court deprived him of his right to present his duress defense when the court prevented him from calling his physician as a witness. At trial, defendant stated that he intended to have a doctor named Dr. Kim testify. Dr. Kim was the surgeon who treated defendant on the day of the incident following his arrest. Defendant also asked the trial court to have testify Aaron Sharezny, the forensic examiner who deemed defendant competent to stand trial. On the first day of trial, the trial court noted that these individuals were not going to be called

as witnesses. The issue arose again during the second day of trial. Garon explained that the psychologist was not relevant to the case. He noted that the trial court had already suppressed the statements defendant made at the hospital. Garon explained that any other testimony that Dr. Kim could provide would not have any bearing on defendant's duress defense. The prosecutor added that defendant had made statements during his hospitalization where he admitted to the armed robberies and implicated himself. The trial court precluded defendant from admitting the testimony of those witnesses.

The trial court's evidentiary ruling did not deprive defendant of his right to present a defense because neither witness would have presented evidence that was relevant to the duress defense. MRE 401 defines relevant evidence as evidence that tends to make a fact more or less probable than it would be absent the evidence, and the fact is of consequence in the action. Sharezny's testimony would not be relevant to the duress defense because his testimony would have related solely to the issue whether defendant was competent to stand trial. Dr. Kim could have testified about the surgical procedure he performed on defendant, but he did not have firsthand knowledge of anything that occurred before or during the carjacking of the victim. Defendant claims that the surgery related to a preexisting injury that would have supported that he could not have run very far, but he fails to explain or offer any proof on how Dr. Kim's testimony would have supported his claim of a preexisting injury or why that preexisting injury was relevant to his duress defense. Before trial, the trial court also had suppressed defendant's statements during his hospitalization at defendant's request. So, any statements defendant made to Dr. Kim about the incident also were deemed inadmissible before trial.

Moreover, defendant has not demonstrated that the failure to allow the testimony affected the outcome of the proceedings, particularly when neither of the witnesses were present during the incident or its aftermath. Defendant does not argue that the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. Therefore, defendant does not demonstrate a plain error affecting his substantial rights. See *Carines*, 460 Mich at 763.

Defendant additionally complains that the trial court did not pay for his medical records. During the pretrial proceedings, Szot explained to the trial court that he intended to move to suppress the statements defendant made to the police while he was hospitalized. He had ordered defendant's medical records in relation to that request and asked the trial court for "some consideration" regarding the costs of those records. However, Szot did not move for repayment of the medical-record costs, so the issue was not before the court. Also, defendant fails to explain how his medical records would have supported his duress defense. The records appear to be relevant only to the trial court's consideration of defendant's motion to suppress, which defendant won. Again, defendant cannot rely on this Court to rationalize his claims for him. See *Payne*, 285 Mich App at 195. Furthermore, defendant has not demonstrated that the failure to allow the testimony affected the outcome of the proceedings, particularly when neither of the witnesses were present during the incident or its aftermath. Defendant does not argue that the error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. Therefore, defendant does not demonstrate a plain error affecting his substantial rights. See *Carines*, 460 Mich at 763.

### III. DOCKET NO. 368313

In both his principal brief on appeal and his Standard 4 brief on appeal, defendant raises challenges to his sentence. Specifically, he argues that the trial court erred by assessing 10 points for OV 4 and 25 points for OV 13. We disagree.

We review the trial court's findings regarding a specific offense variable under the sentencing guidelines for clear error, and a preponderance of the evidence must support the factual findings. *People v Baskerville*, 333 Mich App 276, 291; 963 NW2d 620 (2020). " 'Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo.' " *Id*. at 292 (citation omitted).

## A. OV 4

OV 4 examines whether a victim suffered a serious psychological injury. MCL 777.34(1). Ten points is assessed for OV 4 when "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). MCL 777.34(2) provides: "Score 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive." "The trial court may assess 10 points for OV 4 if the victim suffers, among other possible psychological effects, personality changes, anger, fright, or feelings of being hurt, unsafe, or violated." *People v Armstrong*, 305 Mich App 230, 247; 851 NW2d 856 (2014). However, a victim's fear during a crime, without other evidence of psychological harm, is not enough to assess 10 points for OV 4. *People v White*, 501 Mich 160, 164, 165 n 3; 905 NW2d 228 (2017). Also, the "trial court 'may not simply assume that someone in the victim's position would have suffered psychological harm' " because the harm must have occurred to the victim. *Id*. at 163 (citation omitted).

The trial court did not err by assessing 10 points for OV 4. In her victim impact statement, the victim stated, in relevant part:

> I have been severely impacted by this. I was a friendly person, but now I am completely guarded. . . . I moved to the other side of the town and will not return to the area. I suffer from bi-polar disorder and now I see my counselor twice a month. I constantly see that gun pointed at me. [Quotation marks omitted; emphasis omitted.]

The victim's statement supports that she suffered a serious psychological injury going deeper than simply fear during the crime. The victim stated that the incident changed her personality and required her to move from the area because of the trauma. She has flashbacks where she sees the gun pointed at her. Most importantly, the victim testified that she now sees her counselor, who was previously treating her for bipolar disorder, twice per month. The only reasonable interpretation of the victim's statement is that she has increased her counseling sessions because of the crimes. Additionally, at trial, the victim testified that she no longer engages in her hobby of couponing as often as she used to, and she will sometimes take her children with her. She explained, "I stay at home now because I'm scared. When I do go out, I have to have people with me." Based on this evidence, the trial court did not clearly err in its factual findings because the evidence included more than the victim's fear during the incident. A preponderance of the

evidence supported that the victim suffered a serious psychological injury requiring professional treatment.[3]

## B. OV 13

In his Standard 4 brief, defendant argues that the trial court should have assessed zero points for OV 13 because he did not engage in a pattern of felonious activity involving three or more crimes against a person. He argues that the trial court should not have considered crimes that could have been used to assess points for OV 12.

OV 12 is contemporaneous felonious criminal acts. MCL 777.42(1). Defendant argues that the trial court should have assessed 10 points for OV 12, which occurs when "[t]wo contemporaneous felonious criminal acts involving crimes against a person were committed." MCL 777.42(1)(b). If the defendant did not engage in any contemporaneous felonious criminal acts, then the trial court must assess zero points for OV 12. MCL 777.42(1)(g). A felonious criminal act is considered contemporaneous when two circumstances exist: (1) "[t]he act occurred within 24 hours of the sentencing offense[,]" and (2) "[t]he act has not and will not result in a separate conviction." MCL 777.42(1)(a)(*i*) and (*ii*). The trial court must consider the number of underlying criminal acts, rather than the number of crimes charged from those acts, when scoring OV 12. *People v Stoner*, 339 Mich App 429, 436; 984 NW2d 775 (2021).

OV 13 examines whether there was a "continuing pattern of criminal behavior." MCL 777.43(1). The assessment of 25 points for OV 13 is appropriate when "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." MCL 777.43(1)(c). When "[n]o pattern of felonious criminal activity existed," the trial court should not assign any points for OV 13. MCL 777.43(1)(g). When assessing points under OV 13, "all crimes within a 5-year period, including the sentencing offense, shall be counted regardless of whether the offense resulted in a conviction." MCL 777.43(2)(a). MCL 777.43(2)(c) adds, "Except for offenses related to membership in an organized criminal group or that are gang-related, do not score conduct scored in offense variable 11 or 12."

The trial court did not err by assessing 25 points for OV 13. The crimes of armed robbery and carjacking are both crimes against a person. See MCL 777.16y. The trial court may consider multiple concurrent offenses as part of the pattern of felonious activity even if they arise from the same incident. See *People v Gibbs*, 299 Mich App 473, 487; 830 NW2d 821 (2013) (explaining that multiple convictions arising from the same incident may be considered part of the pattern of felonious activity for purposes of OV 13). As the prosecutor explained at defendant's resentencing, the armed robbery and carjacking convictions were based on separate felonious

---

[3] In his Standard 4 brief, defendant states, in the context of arguing the trial court erred by assessing points for OV 4, "[M]y counsel never investigated as to see when mental health service [sic] were and where who is the Provider?" However, defendant does not raise a separate ineffective-assistance claim or suggest that the basis of his claim was ineffective assistance of counsel. Again, "[a]n appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *Harris*, 261 Mich App at 50.

activities arising from the same incident. The carjacking charge was for the taking of the victim's car, and the armed-robbery charge was for the taking of the victim's personal items. These were multiple concurrent offenses, as opposed to one offense that injured more than one victim. Thus, these acts were part of a pattern of felonious criminal activity but are considered separate crimes against a person for purposes of OV 13.

As for whether the trial court could consider the Wayne County crimes, the prosecutor explained that there were charges pending against defendant in Wayne County in relation to one of the armed robberies. Therefore, that armed robbery could not be considered when scoring OV 12. See MCL 777.42(1)(a)(*ii*). Defense counsel argued that it was more likely than not that the Wayne County Prosecutor's Office would not charge defendant with any further crimes relating to the other incidents more than 3½ years later. At the time of defendant's resentencing, it was not clear whether the Wayne County Prosecutor's Office would charge defendant with any crimes in relation to the other armed robberies. The Macomb County Prosecutor's Office had no control over whether Wayne County would charge defendant in relation to the other incidents. Under these circumstances, the trial court correctly concluded that it could not find, by a preponderance of the evidence, that the acts will not result in a separate conviction. Therefore, the trial court could not consider the Wayne County crimes for purposes of OV 12, which requires that the other acts have not, and will not, result in a separate conviction. MCL 777.42(1)(a)(*ii*). The trial court thus was allowed to consider the crimes under OV 13. Therefore, a preponderance of the evidence supported a pattern of felonious criminal activity involving at least three crimes against a person. The trial court appropriately assessed 25 points for OV 13.

Finally, we note defendant briefly raises the issue of bond in his Standard 4 brief, asserting that the trial court never addressed it. This argument is not true. Bond was set at the time of defendant's bindover, and the trial court indicated during an April 5, 2021 pretrial hearing that it was unwilling to revisit the issue of bond. Thus, defendant's argument lacks merit.

## IV. CONCLUSION

There were no errors warranting relief. Accordingly, we affirm.

/s/ Michael J. Riordan
/s/ Colleen A. O'Brien
/s/ Kristina Robinson Garrett